.Report, in part, of Committee on Privileges and Elections. — Committee asK Power to send for Persons and Papers.
Hr. Raymond, from the committee on privileges and elections, to which was referred the petition of Morgan Johnson praying for the seat occupied by Solomon Moss, as a member of this House, reported in part, and offered for the consideration of the House a resolution in the words following, to wit:
Resolved, That the committee on privileges and elections, to which was referred the petition of Morgan Johnson, claiming the seat as a member of Assembly now held by the Honorable Solomon Moss, from the second district of the county of Niagara, be and is hereby authorized to send for all and every such person and paper as in their judgment may be necessary for the full investigation-of the matter so referred to them.
*207 Substitute offebed.
.Mr. Coe offered the following as a substitute for the said resolution, which was accepted by Mr. Raymond, to wit:
CouNty Judge authoeized to taee testimoNy, pubsuaNtto Statute.
Resolved, That the standing committee on privileges and elections are hereby instructed to receive testimony, which shall be taken before the county judge of Niagara county, in relation to the contested seat of one of the members of this House from said county, in pursuance of the provisions of title fifth, chapter seventh, of part first, of the Revised Statutes.
Debate was had thereon, when Mr. Pruyn moved that the said resolution be laid on the table.
Mr. Speaker put the question whether the House would agree to the said motion of Mr. Pruyn, and it was determined in the affirmative.
Assembly Journal, 1848, pages 128, 129.
CouNty Judge, Niagaba CouNty. — COMMUNICATION fbom.
IN Assembly, February 15th, 1848.
A communication from the county judge of Niagara county, addressed to the clerk, in relation to the seat of Mr. Moss, contested in this House by Morgan Johnson, from the county of Niagara, wa,s received and read in the words following, to wit:

To the Glerk of the Assembly of the State of Few York:

Sib. — In obedience to the statute in such case made and provided, I inclose to you the accompanying evidence taken before me in the matter of the contest by Morgan Johnson of the election of Solomon Moss, as a member of the Assembly of this State.
Yery respectfully, &c.,
H. GARDNER.
LooKpobt, Februcury 8th, 1848.
Assembly Documents, 1848, No. 141.
Ordered, That the said communication be referred to the committee on privileges and elections.
Assembly Journal, 1848, page 379.
*208 REPORT oe MAJORITY OE THE COMMITTEE ON PRIVILEGES AND ELECTIONS.
In Assembly, Myrch 23d, 1848.
Mr. Raymond, from the committee on privileges and elections, to which was referred the petition of Morgan Johnson, praying for the seat in this House as a member of Assembly from the second Assembly district iri the county of Niagara, now occupied by Solomon Moss, reported as follows, to wit:
Report oe the Majority oe the Committee on Privileges and' Elections, on the Petition oe Morgan Johnson, Praying eor ti-ie Seat in the House oe Assembly now occupied by Solomon Moss.
Mr. Raymond, from a majority of the committee to which was referred the' petition of Morgan Johnson, praying for the seat in this House now occupied by Solomon Moss, from the second Assembly district in the county of Niagara, reports that they have had the same under consideration; that the said Morgan Johnson and Solomon Moss appeared before your committee, both in person and by counsel; that an attempt was made by the counsel of said parties, in the first instance, to agree upon a statement of facts which should present the whole case without resorting to the trouble and expense of taking-testimony. This attempt proved unsuccessful, and it then became necessary to send to the county of Niagara to take testimony. Previous to the taking of such testimony, the committee decided, in accordance with the precedents of this House in former years, and the rule as adopted in the case of Orosby against Pierce, in the year 1846, and the case of Hasbrouck against Montanve, of the last House, that they would receive no testimony back of the ballot-boxes as to the qualification of voters, but would determine the question of the contested seat upon the ballots which were actually cast, and would . receive all evidence in relation to the action of the town and county canvassers in receiving, counting and canvassing the votes given.
It was admitted by the parties, that by the result of the official canvass, as declared by the board of county canvassers of the county of Niagara, Solomon Moss, the sitting member, had received three more votes in the said Assembly district than Morgan Johnson.
The said Morgan Johnson rests his claim to the said seat mainly upon the two following grouiids :
1. That in election district number one, in the town of Newfane, in said Assembly district, the inspectors of election improperly and *209 illegally counted and allowed a double ballot to said Solomon Moss, and at the same time illegally rejected and destroyed a ballot for said Johnson, thereby making a difference of three votes against said Johnson and in favor of said Moss. Also, that said election was illegal in consequence of a person being allowed to act as an inspector without being sworn.
2. That the election in the second election district in the said town of Newfane, so far as pertains to the-Assembly vote, should be set aside for illegality and misconduct on the part of the majority of the inspectors of election. That the inspectors in this election district, in their certificate to the board of county canvassers, allowed Solomon Moss a majority of eight votes over Morgan Johnson, which, if set aside, woxdd elect Mr. Johnson by a majority of five votes, to which, if there be added the three votes which he claims in the first election district in said town, would increase his majority to eight.
The counsel for Mr. Moss alleged that the inspectors of election in two or three towns had conducted illegally or improperly to his prejudice, but as these allegations were none of them followed or supported by any proof, the committee deem it unnecessary to notice them in their report.
In support of the allegations of Mr. Johnson, are produced a certified copy of the returns of the inspectors of election in election district number two of the town of Newfane, which in the document hereunto annexed is marked B; also the testimony taken in pursuance of an order of this House, before Hiram Gardner, Esq., judge of Niagara county court, in the presence of both parties, and in the accompanying document is marked C.
No attempt is made to impeach the character or veracity of any of the witnesses, most of whom are officers of elections of the several towns, and presumed to be gentlemen of respectability. The committee have examined the testimony, and consider it entitled to full credit.
Erom this testimony it appears that in canvassing the votes in the first election district of the town of Newfane, a man by the name of Benjamin Stout, who was not an inspector, was permitted to act as such without being sworn. That after having counted the ballots, and found them to agree with the poll list, the inspectors proceeded to open and canvass the same, and after having proceeded a short time, Mr. Stout found a ballot which he declared, to be double, and which he opened, and while opening, one ballot fell on the table *210 while he held the other in his hand, both of which were for Solomon Moss.
The inspectors, with a view of ascertaining whether this was a double ballot, stopped canvassing and proceeded again to count the ballots, to see whether they would correspond with the poll list, and upon such counting they found, that by counting the double ballot for two votes it made an excess of one vote. The inspectors-, instead of destroying said double ballot as the law required, allowed both votes to Mr. Moss, and then proceeded and drew out a ballot from the Assembly box to .avoid this excess, and destroyed it; this proved to be a ballot for Mr. Johnson for Assembly.
The law declares (article 4, section 31 of Revised Statutes, volume 1, page 141, third edition) “ that if two or more ballots shall be found so folded together as to present the appearance of a single ballot, they shall be destroyed, if the whole number of ballots exceed the whole number of votes, and not otherwise.” The object of this statute is to prevent fraud and punish fraudulent voting, by declaring that every elector who conducts in that way shall forfeit his right of suffrage upon that occasion. If the inspectors were correct in counting the ballots and comparing them with the poll list in the first instance, then this excess could arise in no other way than by considering the ballot in question a double ballot. If this circumstance is taken in connection with the declaration of Mr. Stout at the time'of opening the ballot, and the fact of his retaining one ballot in his hand and at the same time dropping the other on the table, which was at the same time picked up by one of the inspectors and placed under the candlestick and subsequently allowed to Mr. Moss, it seems to your committee that there could scarcely have been any room for doubt as to the character of that ballot. It may be urged, it is true, that the fact of this ballot being counted by the inspectors (the said double ballot being found by Mr. Stout and separated by him, leaving no opportunity of examining it by the other inspectors), is evidence that they did not consider it double. This inference might be drawn from that act, if there was no proof to show that they come to a different conclusion ; but your committee believe that the testimony of James Van Horn, Jr., one of the clerks, and Ira Tompkins, one of the inspectors, shows that they did consider it a double ballot, especially after counting and finding that it made an excess of one vote, which did not exist before; and that their error consisted in the manner of disposing of it, after being satisfied of that fact. If these *211 three votes should be allowed in favor of Mr. Johnson, it would leave the parties a tie.
But from the view which your committee have felt bound to take of the other branch of this ease, it is hardly necessary to dwell upon this point any longer.
The great and important question involved in this case, in the judgment of your committee, arises out of the proceedings in election district number two, in this same town of Newfane. It will be seen from a certified copy of the returns made by the inspectors of election in this district, that Solomon Moss &as allowed a majority of eight votes oyer Morgan Johnson.
The accompanying document, marked C, shows that four witnesses were called on the part of Mr. Johnson, including one of the inspectors and oneof the clerks, to testify in regard to the manner in which this election was conducted; and that no witnesses were called, on the' part of Mr. Moss, to contradict or vary the statements of these witnesses.
The testimony of these witnesses, in connection Avith the certified copy of the returns from that district, establishes the following facts :
That there were three inspectors presiding at that election, two of whom belonged to the democratic and the other to the whig party.
That after the board was organized, and before any votes were taken, the two democratic inspectors decided (the other protesting against the decision) that they would keep no separate Assembly box, and that the names of all the candidates voted for should be upon one ballot, indorsed “ State,” and that an elector could not vote for members of Assembly unless the name of the candidate should-be placed upon the State ticket.
That the friends of Mr. Johnson came to the polls with printed ballots cut and folded separately for two boxes, one indorsed “Assembly,” and the other “ State.” That the friends of Mr. Moss, on the other hand, came with a printed ballot, having his name for member of Assembly printed upon the ticket with the candidates for other offices, and indorsed “ State.”
That in consequence of this decision of the inspectors, it became necessary for the (friends of Mr. Johnson, in order to vote at all for him for Assembly, to lay aside their Assembly ballots, and set about writing his name upon the State ballot. •
It also appears that the single Assembly ballot was offered and rejected by the majority of the board of inspectors; that some of the *212 friends of Mr. Moss were engaged in circulating a printed State ticket, containing the n&mes of all the whig candidates, except that of Hamilton Eislq in the place of which Hatiian Dayton was substituted, which had upon it no name for member of Assembly, and was called the “ Dayton ticket.” That in canvassing, seven or eight of these tickets were found in the box, and only one of them had upon it the name for any candidate for Assembly, and that was Morgan Johnson. Alonzo Avery, one. of the electors who voted this “Dayton ticket,” supposed he was voting for Mr. Johnson for Assembly, and who after voting found his mistake, and then wanted to vote for said Johnson, but was prevented from doing so by the decision of the board above referred to. It further appears, from the returns of the inspectors of said district, that there were five more ballots cast for State officers than for members of Assembly, and that whilst there was a difference of but one between the democratic and whig State ballots, there was a difference of eight between the names for member of Assembly on the State ballot. The whole number of ballots cast in this election district indorsed “ State ” was two hundred and thirty-seven, _and the whole number of names for member of Assembly upon those State ballots was only two hundred and thirty-two.
That when the inspectors came to canvass the votes, they found an excess of one ballot indorsed “State,” and they then drew out one^ ballot from the box and destroyed it, which in size and print corresponded with the whig ticket.
Upon these facts, we are called upon to. decide whether herejías not been such an omission of duty and departure from the requirements-of the Constitution and laws of this State, on the part of the inspectors of election in this election district, as either to defeat the popular will or to render it unsafe to rely upon the result as certified by them as a fair expression of it.
Whilst it will be conceded that the certificate of election by the board of county canvassers is prima facie evidence of the right of the sitting member to his seat, it must be borne in mind that this House, by a constitutional provision (see article third, section tenth of the new Constitution), is made the exclusive “judge of the election returns and qualifications of its own members.” T(h§ board of county canvassers act mmisterially and not judicially. They are required to ascertain and' declare the result from the returns made to them by the town inspectors, and have no right to review their decision or correct their errors. But to the House belongs the duty of correct *213 ing all errors or illegal proceedings committed by the district inspectors of election or county, canvassers, whether through mistake or design, in regard, to the election of its members.
The law under which the election was held (see Session Laws of 1847, page 263, chapter 240, section 9, subdivision 2), requires that the name of the person voted for member of Assembly,, in counties' entitled to more than one member, shall be upon a separate ballot, indorsed “Assembly,” and also that the- inspectors of elections shall provide and keep a separate box, indorsed “Assembly,” in which the separate Assembly ballot can be deposited (see section twenty-four), and also requires the clerks to keep a separate poll list, headed Assembly. To prevent any misconstruction of these provisions, or any mistakes in regard to them under this new law, the Secretary of State had prepared, for each election district in this State, forms adapted to them; and his instructions thereon will be found in the pamphlet prepared by him, in pages 75 and 83, No. 9 and No'. 15 ; the law and instructions on the subject are-positive.
The law requiring a separate Assembly box, and a separate ballot in counties containing more than-one Assembly district, grows out of the provision of the new Constitution requiring a residence of the elector for'thirty days next preceding the election in the district from which the officer is to be chosen for whom he offers his vote.
This is a new provision and shows that an elector .may have a right to vote the State ballot, and not the Assembly. A different oath is required in the one case from what is required in the other. The consequence is, that if the name of the Assembly candidate is put upon the State ballot in such a district, there is no oath adapted to the ballot, no challenge could be enforced, and no illegal ballots excluded or detected.
It will also be seen that when there is no separate box or poll lists kept for the Assembly, there can be no mode of correcting a discrepancy between the poll list and number of votes. In this case, there was an excess of one State ballot, when there was a deficiency of fime- Assembly votes. One State ballot was drawn, which must have carried with it an Assembly vote, unless it was one of the six “Dayton tickets,” which contained no Assembly candidate.
The inspector, from the appearance of the ballot and the style of the print, judged it to be a whig ballot, and, if so, Mr. Johnson here lost, one vote in consequence of no separate Assembly box being kept. Another difficulty growing out of this inode of procedure is, *214 that after an elector has voted a State ticket, he is precluded from voting for member of Assembly, which would not he the case if two boxes were kept. In this case, those who voted the Dayton ticket, after finding that they had not voted for member of _Assem-bly, could have supplied the omission, had there been an Assembly box kept. It will be seen that one of them swears that he wanted to do so, hut found that he could not.
It seems' to your committee hardly worth while to pursue this matter further to show the consequences which would result from tolerating a practice of this kind, or to demonstrate that under it no reliance can he placed upon the result as the expression of the popular will. Tour committee are aware that there are a great many provisions in our election’ laws which are regarded as merely directory, and where an omission or neglect on the part of 'the inspectors to comply with the forms of proceedings, have been held not to vitiate an election, but it will be seen that the decisions in those cases are based upon the ground that the intention of the elector shall be ascertained, wherever it can he, and whenever the departure from the law lias not been such as either to defeat this intention or to prevent its being ascertained, it has been disregarded.
Now to apply this principle to this case. It cannot be denied but what here was a denial of the exercise of the right of suffrage by a majority of the inspectors, to the electors in the only way authorized by the Constitution and laws. If permitted to vote at all for members of Assembly, it was not in pursuance of law, hut in violation of law. It is impossible to ascertain, with any certainty, what effect this decision had upon the election, hut, from the testimony before us, it is fair to presume that it was sufficient to change the result between the parties. If there had been two boxes and two separate ballots voted, there would have been no chance for the perpetration of any wrong or fraud with the “ Dayton ticket,” so far as the Assembly candidates were concerned.
IIow does it happen that the “ Dayton tickets ” (with one exception, which is accounted for), and those alone, contained no candidate for Assembly ? Are we to presume that there were six whigs who voted the “Dayton ticket ” who would not'vote for Mr. Johnson, when all voting the other whig State ticket did vote for him ? Such a presumption would he wholly unwarranted by the circumstances of the case. . ,
We think the fair presumption, from the testimony, is that these *215 electors supposed they were voting for all the whig candidates except Mr. Fish!
But, it may be ashed, what effect the setting aside of the election so far as pertains to members of Assembly in this election district, would have upon the other portion of the ticket ? We think it would not vitiate it, for the reason that the error consists in voting the Assembly and not the other candidates upon a wrong ballot and in a wrong box.
If an elector undertakes to vote for more candidates upon the same ticket than there are persons to be.chosen to the office designated, the whole ballot is not to be destroyed, but in the language of the Secretary of State, “ so far as the ballot is correct for each description of officers, it should be canvassed and estimated, and the remainder only rejected.” See his instructions under form No. 18, page 86.
Suppose two boxes had been kept, and the names of the candidates for State officers were found upon an Assembly ballot with the candidate for Assembly, could it be allowed? If so, then the elector might have the advantage of voting twice for the same candidates. But this cannot be the case when a ballot properly indorsed is found in the wrong box, through the fault of the inspectors. If the foregoing reasoning is correct then it follows, as a matter of principle without regard to consequences, that the inspectors erred fatally in their first decision as to the mode of voting; and secondly, they erred in not rejecting in the canvass all the names for Assembly candidates upon the State ticket as illegal or defective ballots. In either event Morgan Johnson would have a majority of the legal votes cast in the Assembly district.
The basis of representation is suffrage. The right to choose representatives is every man’s part in the exercise of sovereign power— to have a voice in it if he has the proper qualifications; that is, the fundamental exercise of political power by every elector. That is the beginning. That is the mode in which power emanates from its source and gets into the hands of conventions, legislatures, courts of law and the chair of the executive. It begins in suffrage. Suffrage is the delegation of the power of an individual to some agent. If this be so, then follow two other great principles.
1st. The first is, that the right of suffrage shall be guarded, protected, secured against force and against fraud, and
2d. The second is, that its exercise shall be prescribed by previous law ; its qualifications shall be prescribed by previous law ; the time *216 and place of its exercise shall he prescribed by previous law; the manner of its exercise, under whose supervision, always sworn officers of the law, is to be prescribed. And then, again, the results are to be certified to the central power by some certain rule — by some known public officers — in some clear and definite form, to the end that two.things may be done: first, that every man entitled to vote may vote; second, that his vote may be sent forward and counted, and so he may exercise his part of sovereignty in common with his fellow men.
In the exercise of political power through representatives, we know nothing ;• we never have known anything but such an exercise as should be carried through the prescribed forms of law, and when we depart from that, in any of its substantial provisions, we shall be endangering our institutions, 'and' left like, a ship at sea, “ without rudder or compass.”
The people limit themselves in various ways; they limit themselves in this first exercise of their political rights; they limit themselves by their Constitution in two important respects ; that, is to say, in regard, to the qualifications of the electors, and in regard to the qualifications of the elected. ' They have said, we will elect no man who has not such and such qualifications. ¥e will not vote ourselves without we have such and such qualifications. They have also limited themselves to certain prescribed forms for the conduct of elections. They must vote at a particular place, at a particular time, and under particular conditions, or not at all. It is in these modes that we are to ascertain the will of the people, and our Constitution and Laws know no other mode.
The undersigned, a majority of your committee, have, therefore, come to the conclusion, that it would be establishing a very dangerous precedent for this House to allow inspectors of elections, who are the agents of the electors, to disregard the Constitution and Laws, provided for their protection, and manage the polls according to their own fancy, thereby preventing the electors from' exercising their suffrages. We cannot, therefore, sanction the conduct of said inspectors of election, -without holding out a positive inducement to disregard the “ Constitution and Laws of this State, as welj as the regulation ayd instructions of the Secretary of State for protecting the fairness and preserving the purity of elections. And ask leave to' introduce the following resolutions:
*217 Resolved, That Solomon Moss is not entitled to the seat as member of Assembly, now occupied by him.
Resolved, That Morgan Johnson is entitled to the seat as member of Assembly, now occupied by Solomon Moss.
All which is respectfully submitted.
BA ML. G. RAYMOND.
G. W. BUCK.
ROBERT I-I. PRUYN.
March 21 st, 1848.
Assembly Documents, 1848, No. 147.
On motion of Mr. Myres,
Ordered, That the said report be laid on the table.
Mr. Ransom moved that five times the usual number of the said report be printed for the use of the Legislature.
Ordered, That the said motion be referred to the committe on public printing.
Assembly Journal, 1848, page 823.
REPORT OP THE MINORITY OE THE COMMITTEE ON PRIVILEGES AND Elections.
In Assembly, March ‘i&th, 1848.
Mr. Myers, from a minority of the committee on privileges and elections, to which was referred the petition of Morgan Johnson praying for the seat in this House as member of Assembly from the second Assembly district in the county of Niagara, now occupied by Solomon Moss, report against the petition, as follows:
Minority Report.
The undersigned, minority of the committee on privileges and elections, to whom was referred the petition of Morgan Johnson, beg leave to report:
That the said committee have had the same under consideration, with the proofs submitted on the part of the contestant and herewith submitted, and that it was admitted by both parties that Solomon Moss had been declared by the county canvassers' duly elected by a majority of three votes.
The undersigned conceive the indisputable and only safe or tolerable rule to be, that the sitting member having received the certificate of the only regular and constituted tribunal having jurisdiction *218 in that behalf, is to be presumed to he elected. That this presumption can only be overcome by express proof to the contrary, and that the onuspróbandi lies upon the contestant. .The rule .is a familiar and fundamental one, that every jiublic act or proceeding of any constituted public body or public officer having jurisdiction of the subject-matter, is to he presumed regular until the contrary is established by proof, and that inferior or secondary proof is not admissible until the absence of the higher or primary proof is satisfactorily accounted for.
The undersigned believe that their difference of opinion with the majority of your committee arises from their adherence to the rules aforesaid, which, in their judgment, the said majority have departed from in their consideration of this subject.
The, undersigned fully admit that this House is the sole judge of the qualifications of it.s members, but they do not admit that this power can be rightfully exercised arbitrarily or in violation of the rules of evidence or of the uniform and well settled principles of law or the practice of representative bodies. These are the protection and the only protection of minorities in representative assemblies, and if this power be not so restrained, if this right to judge is not thus limited, then majorities, even small majorities, have it always in their power to annihilate opposition.
Only two points were made and argued before the committee :
1st. That in election district Ho. 1, in the town of Hew Eane, the inspectors of elections improperly and illegally counted and allowed a double ballot to Moss, and at the same time illegally destroyed a ballot for Johnson, thereby making a difference of three votes against Johnson. Also, that said election was illegal in consequence of a person being allowed to act as an inspector without being sworn.
2d. That the election'in the second election district in the town of Hew Fane, so far as pertains to the Assembly vote, should be set aside for illegality and misconduct on the part of a majority of the inspectors of election. ’ That the inspectors of this election district in their certificate to the board of county canvassers, allowed Solomon 'Moss a majority of eight votes over Morgan Johnson, which, if set aside, would elect Mr. Johnson by a majority of five votes, to which, if there be added the three votes which' he claims in the first election district in said town, would increase his majority to eight.
The first of these points it was unanimously agreed at the last meeting of your committee, was not made out and should be consid *219 ered as waived and not mentioned in the report, and the undersigned were much surprised to see in the majority report that this point is still insisted upon through some pages of manuscript.
The undersigned insists that there is no legal evidence of the fact alleged in regard to the double vote ; at the best, no such evidence as the contestant was bound to produce to substantiate his point. It is proven that the inspectors first counted the ballots and pronounced them to agree with the poll list in number ; that they then commenced to open and read the ballots, and in the language of the witness, Yan Horn, “after reading from a dozen to twenty or thereabouts, Mr. Benjamin Stout said, ‘here are two votes or two ballots'together;’, we then stopped tallying and proceeded to count the votes again to see whether there would be an excess.” Mr. Ira Tompkins testifies (and he was an inspector produced by Mr. Johnson,) “ Mr. Stout was sitting by the side of me at said canvass, and after having proceeded to open the ballots and to tally the same a very short time, Mr. Stout spoke and said they found a double vote, and at the same time held a vote in his hand over the table, and I observed-a vote fall from his hand, and picked it up, etc.” They then proceeded to count the ballots again,' and finding an excess of one, replaced them all in the box and mixed them, and Mr. Tompkins held the box to Mr. Reynolds, who drew one out and handed it to Mr. Tompkins, who destroyed it.
These are the material facts proven on this point. It is. true Mr. Tompkins is made to swear that the ballot destroyed was for Johnson ; a fact which he could only know by a violation of the spirit if-not the letter of the law, which declares the ballots so drawn “ shall be destroyed unopened, and without seeing the same;” and these ballots having before been opened, it would seem that a proper appreciation of the intent of the law would have impelled the inspector, to destroy the vote so open without reading it, but the undersigned presume that this and other similar facts of a partisan character urged in the report of the majority of your committee, will not influence the judgment of this House.
The statute, 1 R. S., part 1, chapter 6, title 4, article 4, § 37, provides, “ each box being opened, the ballots contained therein shall be taken out and counted unopened, except so far as to ascertain that each ballot is single.; and if two or more ballots shall be found so folded together as to present the appearance of a single ballot, they shall be destroyed if the whole number of ballots exceed the whole number of votes, and not otherwise.”
*220 Section 89 of the same statute provides, “ if the ballots shall be found to exceed in number the whole number of votes in the correspondent columns of the poll lists, they shall be replaced in the box, and one of the inspectors shall, without seeing the sanie, publicly draw out and destroy so many ballots unopened as shall be equal to such excess.”
' The inspectors a2re made the judges whether it is the case of a double ballot, or of a mere excess. If the former, the elector loses his vote, by the destruction of both ; if the latter', the excess only is destroyed. The exercise of this discretion is not easy of review by .this Housé, because the decision depends entirely upon inspection at the time, and no description can give to this House the same means of judging as to those who were present. The decision, therefore, of the inspectors upon such a point in the absence of any proof of bad faith, should be conclusive. Did they decide ? We think they did, by taking the course prescribed/bf an excess and. not that for a double ballot. This is conclusive as to what was the judgment of the inspectors. Can this House say from the evidence that they erred ? Is it certain that the first count was accurate, and that then there was not an excess % What more common than an error of one in counting several hundred? But it seems to the undersigned the judgment of the inspectors in this respect should govern, and that they not having found or treated this as a double ballot, this House cannot do so.
And what evidence is there that there was a double ballot ? « Why, it rests in the fact that the first count agreed with the poll list; that- “ Mr. Stout, said there was a double vote” and that the second count showed an excess of one. Now this is a fact which the contestant is bound to prove if it existed, and to prove by the best evidence, or to lay the foundation for the introduction of secondary evidence by showing that the best was beyond his reach. There is no proof but that Hr. Stout might have been produced as a witness, and he was the only person who J&new whether the ballot was or was not double. The inspector only saw that “he held a vote in his hand over the table,, and observed a vote fall from his hand,” and the clerk, Hr. Van Horn, only swears, “Hr. Benjamin Stout said, ‘here are two votes or two ballots together.’ ” This evidence is therefore entirely hearsay, upon which no man in a court of justice would be deprived of a sixpence, afid upon which the undersigned are confident no man will be deprived .of a seat in this House. "The positive proof was *221 within the reach of the contestant, as must be presumed in the absence of proof to the contrary, and it is further to be presumed would have been produced if it would have advanced his interests. Mr. Stout may have declared the ballot double upon an impression which would not stand the scrutinizing test of a cross-examination. He might have used the words as the expression of an opinion, not the assertion of a fact; he might have said it mischievously or corruptly, and still, if proof of his having said so is allowed to established the fact, a member might be deprived of his seat -in this House by such mistake, want of precision or corruption.
The second branch of the first point, “that the election was illegal in consequence of a person being allowed to act as an inspeetór without being sworn,” may be dismissed with the remark, that it is not insisted on in the majority report. It is not proven in the evidence submitted, and if it were, would come within the principle hereinafter discussed..
It remains to consider the second point made before the committee. That upon the decision of the inspectors of the second election district of the town of New Fane, that they would use but one box and that the Assembly vote should b„o taken upon the State ticket.
The “act entitled an act respecting elections other than for militia and town officers, passed April 5th, 1842,” provided in this respect by section 9 : “ the names of all the persons voted for by any elector at any election excepting electors for President and Yice-President, shall be upon one ballot, which ballot shall be indorsed State.” This statute had been for some years in force, and by it the vote for member of Assembly in all counties was upon the ticket indorsed ‘ State,’ and deposited in the box marked ‘ State.’
The act amending the act last above mentioned, passed May 8th, 1847 (Laws of 1847, page 264, section 9), provides in subdivision of said section : “ In counties entitled to more than one member of Assembly the name of the person voted for by any elector for member of Assembly at any election, shall be upon a separate ballot and indorsed ‘Assembly;’ ” and on page 266 in section 13, which directs the boxes to be kept, is found the following provision : “ Also in the proper counties a box in which all ballots which are required by the said ninth section to be indorsed ‘Assembly,’ shall be .deposited.”
The testimony shows that in the county of Niagara there were two Assembly districts, and that in the second election district in the town of New Fane, in the second Assembly district of that county *222 the inspectors of elections decided according to the testimony of Mr. Enoch Stahl, “ that the law did not require but one boxwhich decision was made by the. majority of the inspectors whom Mr. Stahl testifies under Mr. Moss’ objection, were democrats.
It is seen by the statute above extracted, that this decision of the inspectors was erroneous, and this is fully conceded by the undersigned, and that it is to carry with it all the legal consequence of error in such particular, notwithstanding there is no kind of proof of intentional wrong on the part of the inspectors, or that the law which was then lately passed and was then for the first time to be brought into practical application was brought to their actual notice or knowledge; still, bg legal presumption every man, and more particularly every public officer, is presumed and bound to know what the law is.
Is there any evidence that this decision of the inspectors actually altered the result against the contestant; that by it any person was prevented voting for Mr. Johnson, who would.have otherwise done so? If this is proven, the undersigned admit it to be within the power and duty of this House to correct; but it must be gyroved by the contestant, and is not to be presumed, the oñus probandi lies upon Mr. Johnson.
The only evidence material to this point which has been adduced, is as follows : Mr. Bostwiek in his direct examination testifies: “ there were votes indorsed for ‘Assembly,’ separate from the State officers offered to the board and rejected. I do not know, however, that there was more than one such occurrence, nor do I recollect who it was that offered that vote.” And on his cross-examination he testifies : “ I do not know hut the person who offered the separate Assembly ticket, and whose vote was rejected as stated in my direct examination, afterwards voted, nor do I know whether he did or not vote for member of Assembly.”
Mr. Philander Ward testifies : “I think I offered to vote for member of Assembly by a ticket which was separate from the State ticket, and that it was rejected by the board because it was so separate from the State ticket; I do not recollect of seeing any other such ticket offered.”
This, in the absence of all other proof, may fairly, nay must be presumed to be the offer mentioned in the testimony of Mr. Bostwiek above extracted.
On his cross-examination, Mr. Ward testifies: “I voted at the said election poll for Morgan Johnson for member of Assembly, after I *223 had so offered the separate vote which was rejected, as before stated.”
Thus far, then, there is no evidence that Mr. Johnson was prejudiced by the said erroneous decision of the inspectors. The contestant, in defiance of the resolution of the committee, mentioned in the report of the majority, “not to go back of the ballot-box,” has given much evidence as to the circulation of a ticket called the “ Dayton ticket,” and the inducements held out by those ’'lío circulated it to the electors to induce them to vote that tick / The undersigned cannot suppose that this House will set the example of going back of the ballot-boxes to see whether any and what false pretenses or unfounded arguments or persuasions were used to induce electors to vote, or prevent them from voting, in any particular way. This would open a field of litigation so broad as to render all elections insecure. Electors are bound to exercise their judgment, discretion and vigilance, and it may perhaps be safely asserted that ño contested election was ever held when unfounded arguments, and more or less of false assertions, were not used to influence electors, and these are not inquired into. The majority of the committee, however, have followed the course of proof of the contestant in this respect, and ask this House to presume, in the absence of proof \ to that effect, (except as hereinafter stated) that all the persons who voted this Dayton ticket, save one, intended to vote for the contestant, and were prevented by the decision of the inspectors; that they would keep but one box. Can any snch presumption be established consistent with principle, and the rules as to presumption ? The undersigned-confidently answer no.
Were the electors compelled to vote a ticket without the name of-member of Assembly thereon, in consequence of the decision of the inspectors, and the votes having been separately prepared^? Mr. Philander "Ward, a witness produced by the contestant, and who swears he voted for him, says, after having stated that the whig tickets, after the said decision, had the name of Morgan Johnson for member of Assembly, written upon them, “ I cut the tickets apart; I should think they were prepared in such numbers as to supply all ydio wished to vote that kind of ticket, and were peddled among1 the electors after being so prepared.”
Mr. Alonzo Avery, a witness, also produced (as is indeed every witness whose testimony has been submitted) by the contestant, testifies that he voted the “ Dayton ticket,” and under objection gives *224 tlie conversation with .the person who induced him to vote that ticket, which was in substance, that it was the “ straight ” whig ticket, with the exception of Mr. Dayton’s name — testimony in no wise admissible. He then farther testifies : “After finding out that I had not voted for member of Assembly, I made efforts to do so, and desired to vote for Morgan Johnson. I inquired of somebody, but whom I do not remember, if I could then vote for member of Assembly. He told me I could not, and I did not therefore try any more.” This is all the testimony submitted which the undersigned believe is material to the point, and upon which the majority of your committee come to the conclusion that electors were prevented from voting for Mr. Johnson by the decision of the inspectors. It is apparent that none were so prevented but Mr. Avery, and he not by the direct decision of the board, but by the opinion of some unknown bystander, as to the effect of their' previous decision, and this, if true, only the consequence of Mr. Avery’s carelessness in not reading his ticket, to see whether he voted for member of Assembly or not. But it is alleged that if a separate box had been kept, the persons who voted the “ Dayton ticket ” might afterwards have voted for Mr. Johnson. This is true as it regards Mr. Avery, and might be urged, if he had actually offered his vote and it had 'been rejected, and would then have fairly made a difference of one vote for Mr. Johnson; but it cannot be urged upon the bare testimony'that he desired so to vote, unaccompanied by an actual tender and rejection thereof,-as to the* other persons who voted the “Dayton ticket.” There is no. evidence whatever that they wished to vote for member of Assembly at all, much less that they desired to vote for-Mr.-Johnson, and the whole argument in -this behalf in his favor rests in naked presumption.
In regard to the effect of the decision of the board in respect to the ballot drawn out, and the reasons of the Legislature in providing for a separate box in counties where there- are more than one Assembly district, and connected therewith the qualifications for electors, it is perhaps sufficient to remark that the whole thing stood under the decision of the inspectors, precisely as by law it would in a county where there is but one Assembly district. That the qualification for an elector for member of Assembly includes all the qualifications required for the other officers, and therefore no man entitled to vote that tieheb could - be excluded from any other, and that the evidence that the ticket drawn v^as.a “whig ticket,” .rests only *225 on vague presumption, and inadmissible hearsay, and all stop short of showing it was a vote for Mr. Johnson.
The.position that all these ballots are to be rejected because they are found in the wrong box, in a district where but one box was kept, the undersigned will not here attempt to refute by argument. If some hundred of electors are to be disfranchised upon a position like this, the undersigned will leave that work to the “responsible majority.”
It now only remains to consider what is the effect upon the election of a departure by the inspectors of the requirement of the statute to keep a separate box in counties entitled to more than one member of Assembly. It has been shown that no injury is proven ; or, at most, the injury, by the most liberal construction, can only extend to one vote, that of Mr. Avery, which, if admitted to be properly established (and the undersigned by no means concede it is) would not affect the result. The majority of the committee insist that this erroneous decision vitiates the whole poll, and that it must be all set aside as to Assembly. The reason would be quite as strong to set it aside as to the rest of. the ticket. They say, however, that though other provisions of the statute are “directory,” this is matter of substance. The undersigned do not think this provision more matter of substance than many other provisions of the statute which have been held to be directory, and that a- departure, though it might subject the inspectors to indictment and punishment, does not destroy the ballots cast; the intention of the electors governs.
The provisions regulating the mode of proceeding at an election are so far directory that a departure from them never vitiates, unless it is clearly shown by the contestant that a. compliance with them would have produced a different result.
In other words, it is not sufficient ground fór'interfering that some prescribed form has been departed from or omitted, but the contestant must show that if the form had been observed the result would have been in his favor. The consequences of a contrary doctrine would vitiate every election, and the principle contended for would put it in the power of any board of inspectors to disfranchise all the electors in their district by intentionally making an erroneous decision, and visit the sins of the guilty inspector upon the innocent elector; a state of things not to be endured.
Take, for example, a few of the numerous provisions of the statute, from which the one. under consideration cannot be distinguished. 1 *226 B. S.j 140, § 31, 3d ed., declares that each inspector shall challenge every voter whom he knows or suspects not to be qualified. Suppose it could be proved that an inspector willfully neglected to perforin this duty, would that set aside the whole poll %
Section 28 provides, where the inspectors receive a ballot, one of them, without opening the samé, shall deposit it in a box, etc. Suppose it could be proved that he opened and read it, and then put it in, would that vitiate the whole poll, or even that particular ballot ?
Section 37. In canvassing, each box being opened, the ballots contained therein shall be taken out and counted imopenedj except so far as to ascertain that such ballot is single. If it were proven that it was opened rather more than was necessary, would that vitiate either the ballot or the poll %
There are a variety of other provisions of a like character; we will ' refer to only one or two more. The law is rigid in forbidding the receipt of illegal or spurious votes, much more so than as to the form of receiving legal ones, and with good reason. Yet, suppose the inspectors knowingly and willfully receive illegal votes, is the election ' thereby vitiated ? Most clearly not, and the law presumes so strongly against the contestant that he must show both the deviation and the injury. The supreme court of Massachusetts, in First Parish of Sud-bury v. Steans, 21st Pickering, 154, says: “It is no objection to an election that illegal votes were received, unless the illegal votes changed the majority; the mere fact of their existence never avoids an election.” “ The burden of proof, too, is always upon the persons contesting the election.” (See, also, ex parte Murphy, I Co wen, 153.)
In some cases the law expressly directs the period within which a canvass shall be commenced and completed; as, in New York, the canvassers shall complete the canvass on the day subsequent to the closing of the poll. If they do not, the election is not thereby affected. (Ex parte Heath, 3 Hill, 46-1.)
In Arnold v. Lea, a case arising in Tennessee, reported in Clark’s Contested Elections in Congress, 601, the statute provided : “ Ballots to be placed in a box, which shall be locked or well secured.” In that case a large gourd was used instead of a box; the variance was held not to invalidate the election.
The same case decides that the inspectors of a particular precinct, not having been sworn as directed by the law, did not vitiate the election ; nor where a justice being an inspector swears himself, and *227 in Strong, petition, etc., 20 Pickering, 491-2, the general rule is laid down broadly that ail illegal act on the part of the canvasser shall not affect the resalt; they shall be punished if they act corruptly,’ but the election shall stand good.
The undersigned recommend the passage of the following resolution :
Resolved, That the prayer of the petitioner ought not to be granted.
Respectfully submitted.
CHAS. G. MYERS.
VM. SIDNEY SMITH.
Assembly Document, 1848, vol. 5. No. 148.
On motion of Mr. Myers,
' Resolved, That the said report and resolution be laid on the table, and that it be printed in connection with the report of the majority of the committee, for the use of the Legislature.
Assembly Journal, 1848, page 865.
REPORT OP MINORITY ADOPTED.-MORGAN JOHNSON AWARDED THE Skat.
In Assembly, Ajyril 1st, 1848.
The House then proceeded to the consideration of the resolutions heretofore reported by the committee on privileges and elections, in the words following, to wit:
Resolved, That Solomon Moss is not entitled to the seat as member of Assembly now occupied by him.
Resolved, That Morgan Johnson is entitled to the seat as member of Assembly now occupied by Solomon Moss.
Debate was had thereon, when Mr. ^Speaker put the question whether the House would agree to the said first resolution, and it was determined in the affirmative.
Ayes, Y2. Nays, 28.
Mr. Speaker then put the question whether the House would agree to the said, last mentioned resolution, and it was determined in the affirmative.
Ayes, J3. Nays, 2Y.
Mr. Johnson Sworn in.
Morgan Johnson, the said member of Assembly elect from the second Assembly district, county of Niagara, then appeared at the chair *228 of the Speaker and took and subscribed the'oath of office prescribed by the Constitution of this State.
Assembly Journal, 1848, pages 1027, 1028, 1029.
An Act Providing eoe Payment oe Expenses of Moss and Johnson in Contesting Seat.
In Assembly, April 3cl, 1848.
Mr. Raymond, from the committee on the judiciary, asked for and obtained leave to bring in a bill entitled “An act to provide for paying certain expenses to Solomon Moss for defending, and Morgan 'Johnson for contesting the right to seat as a member of this House,” which was read the first time.
On motion of Mr. Raymond,
Ordered, That the said bill be committed to the committee of the whole House when on the engrossed bill from the Senate making appropriations to the State Library.'
Assembly Journal, 1848, page 1031. See, also, Assembly Journal, 1848, pages 1039, 1042, 1076, 1340, 13'65.